# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | |
|---|---|
| **MAZEN S. HAMDAN** | **CIVIL CASE NO. 05-1293-L** |
| **VS.** | **SECTION P** |
| **GARY COPES, ET AL.** | **JUDGE MELANÇON** |
| | **MAGISTRATE JUDGE METHVIN** |

## REPORT RECOMMENDING PARTIAL DISMISSAL OF CLAIMS

Before the court is the civil rights complaint filed pursuant to 42 U.S.C. §1983 by *pro se* plaintiff Mazen S. Hamdan on July 18, 2005.[1] Plaintiff complains of conditions of confinement while he was incarcerated at the South Louisiana Correctional Center (SLCC) in Basile, Louisiana during the period from January 13, 2004 through August 2, 2004.[2] He names as defendants SLCC Warden Gary Copes, Assistant Warden David Viator, Major Michael Streidell, Captain Ray Rider, Captain Arlis Celestine, Lieutenant Michael Boutte, Lieutenant Susan Whetstine, Medical Administrator "John Doe," and, Nurse Jimmy L. Powers. Plaintiff seeks the following relief: declaratory judgment, injunctive relief, and compensatory, punitive, and

---

[1] The "mailbox rule" provides that a prisoner's federal pleadings should be considered to have been filed as of the date the pleadings were presented to the prison authorities for mailing. See *Houston v. Lack*, 487 U.S. 266, 270-71, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). Ordinarily, the date that the pleadings were signed is considered the earliest date upon which the pleadings can be said to have been filed. In this instance, plaintiff signed his petition and memorandum and his in forma pauperis application on June 16, 2005. [doc. 1-1, p. 8; doc. 1-3, p. 57; doc. 2, p. 1] However, he did not mail the pleadings until July 18, 2005, and, he used a residential address as the return address. [see doc. 1-1, p. 10] In this instance, it thus appears that July 18 is the earliest date that the pleadings may be considered to have been filed in the absence of any contrary evidence.

[2] When he filed this complaint plaintiff was an inmate in the custody of Louisiana's Department of Public Safety and Corrections, incarcerated at the Orleans Parish Prison, New Orleans, Louisiana. See Doc. 1-1, p. 6, paragraph II; see also in forma pauperis application, Doc. 2; but see Doc. 1-3, p. 2 paragraph II-2 wherein plaintiff alleged that he was confined at the C. Paul Phelps Correctional Center, DeQuincy, Louisiana. In a letter dated October 11, 2005 plaintiff advised the court that he is no longer incarcerated and resides in Gretna, Louisiana. See Doc. 9.

nominal damages.

The complaint was referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the court. For the following reasons, it is **RECOMMENDED** that the following claims be **DENIED AND DISMISSED** with prejudice as frivolous and for failing to state claims on which relief may be granted: claims concerning 1) conditions of confinement; 2) disciplinary proceedings; 3) exposure to environmental tobacco smoke; 4) retaliation; 5) the free exercise of religion; 6) verbal taunting; 7) equal protection violations; and 8) an inadequate grievance procedure.

With regard to plaintiff's medical care claims, the undersigned concludes that further information is needed before a disposition can be recommended.

### Statement of the Case

Plaintiff's complaint comprises fifty-seven handwritten pages which set forth five broad grounds for relief in 224 paragraphs. Plaintiff contends that (A) he was denied adequate medical care [¶ 29-52]; (B) he was exposed to environmental tobacco smoke and biological pollutants [¶ 53-79]; (C) [¶ 80-102], (D) [¶ 103-142], and (E) [¶ 143-197] he was the victim of retaliation, was wrongfully convicted of disciplinary violations, and placed in lock-down on three separate occasions. As is shown hereinafter, plaintiff argues additional claims arising during the course of his incarceration.

Plaintiff's allegations as to each ground are as follows:

**A. Denial of Medical Care**

**1. Dental Problems**

Plaintiff alleges that on January 20, 2004, he filed a medical request complaining of a

toothache which made eating and sleeping difficult.  When plaintiff did not receive a response within seven days, he approached the medication window and advised Nurse Michele of his predicament.  She informed plaintiff that he was on a list to see the dentist and that it was improper to inquire about sick call requests at the medication window.  She advised him that such behavior could result in a disciplinary charge.  On February 16, 2004 plaintiff filed a grievance concerning the medical department's failure to respond to his toothache complaint. Plaintiff's grievance went unanswered.  On March 8, 2004 plaintiff filed another medical request complaining about his tooth. The medical department  did not respond.  Plaintiff then informed his brother by telephone about his dental problem and the medical staff's failure to respond.  On some unspecified date in June, 2004, plaintiff's brother called "the unit head" to inquire about plaintiff's complaints. Unnamed prison officials advised plaintiff's brother that they would investigate the matter.  "On June 31 [sic], 2004 ... plaintiff filed ... another medical sick call request..." On July 1, 2004 at 12:30 a.m. plaintiff was examined by Nurse Jimmy L. Powers who gave plaintiff Tylenol® and told him that he would be added to the dentist's waiting list.  Powers also advised plaintiff that he had not previously been placed on the waiting list by Nurse Michele as she had earlier indicated.  Plaintiff claims that he was never examined or  treated by a dentist while he was incarcerated at SLCC.

### 2. Cold

Plaintiff alleges that on May 10, 2004 at 10:00 p.m., plaintiff became ill because of "...extremely cold temperatures via air conditioned unit and unsanitary conditions and him being forced to sleep on a rat feces infested floor..."  Plaintiff complained to Corrections Officers who, at approximately 11:30 p.m.,  notified Nurse Powers.  On May 11 at midnight, Nurse Powers

entered plaintiff's cell and "began to make hateful remarks against plaintiff." Powers refused to check plaintiff's temperature and threatened to write him up for malingering. On May 12 and 14, 2004 plaintiff filed sick-call requests complaining about the symptoms he experienced on May 10. His requests were ignored.

### 3. Back Pain

Plaintiff alleges that on May 18, 2004 plaintiff filed a sick-call request complaining of back pain. His request was ignored. On June 20, 2004 plaintiff resubmitted his May 18 sick-call request. On July 27, 2004 plaintiff filed another sick-call request complaining of back pain. The medical department did not respond to any of plaintiff's back pain requests.

### B. Exposure to Environmental Tobacco Smoke and Biological Pollutants

Plaintiff alleges that on January 19, 2004, he filed a grievance complaining about inadequate ventilation and exposure to high levels of second-hand tobacco smoke. Plaintiff received no response to his grievance. On February 16, 2004 plaintiff filed a second grievance, this time complaining about the administration's failure to respond to his January 19 grievance. Plaintiff received no response. Between January 22, 2004 and June 16, 2004, plaintiff submitted six requests to be moved to a non-smoking dormitory. None of his requests were answered.

On June 23, 2004 plaintiff filed a grievance complaining about the administration's failure to respond to his requests to be moved. On June 29, 2004 the grievance was assigned Case Number 04-177. On the same date Defendant Viator rejected the grievance stating "...occasional or mild exposure to secondhand smoke in a well-ventilated area is acceptable..." Viator also advised plaintiff that SLCC had no non-smoking dorms.

On June 30, 2004 plaintiff filed a Step-Two grievance in case number 04-177. On July 1,

2004 his second-step grievance was rejected.

On June 30, 2004 the air conditioner for Wolf Unit-3 malfunctioned further aggravating the second-hand smoke situation. On July 7, 2004 plaintiff filed a grievance and requested immediate relief in the form of opening a non-smoking dorm or fixing the air conditioner. On July 9, 2004 this grievance was assigned Case Number 04-184. On that same date the grievance was rejected by defendant Viator, who replied, "A broke air conditioner is a routine maintenance problem and is not an emergency." On July 12, 2004 plaintiff filed a second-step grievance. On July 15, 2004 the grievance was rejected.

Plaintiff claimed that throughout this period the air in Wolf Unit was polluted with dust, mold, lint particles, and excessive cigarette smoke; that there was a brownish layer of nicotine residue on the ceiling; inmates' blankets, sheets, and clothing were polluted with cigarette smoke; the ventilation unit in Wolf Unit was inadequate; and due to the structure of the unit shower, the unit was very humid, causing mold growth on the west wall. Plaintiff claimed that as a result of the pollution he suffered severe headaches, watery eyes, runny nose, nasal congestion, itching, coughing, and "mucus full of dust and lint."

Plaintiff filed a medical sick-call complaining about these illnesses on March 15, 2004. His sick-call was ignored. He filed another sick-call on April 1, 2004 and it, too, was ignored.

### C. First Placement in Lockdown

Plaintiff alleges that sometime in February, 2004, at approximately 6:30 p.m., he and some of his fellow inmates were studying the Qu'ran and engaged in communal worship. An unidentified corrections officer interrupted the service by shouting, "break this shit up..." Plaintiff confronted the guard concerning his right to freely practice his religion and the guard

responded, "I don't care about your bull shit religion." Plaintiff requested an opportunity to speak to a higher authority but his request was ignored.

At midnight one night (presumably in February, 2004), plaintiff was "counseling" a fellow inmate about the Muslim faith. The Corrections Officer summoned plaintiff to the control center and told him that he was being too loud and that he could be heard through the control center window. The officer further reminded plaintiff of the lateness of the hour. Plaintiff disputed the officer's statement and the officer demanded that plaintiff get to his knees and face the wall. Plaintiff refused and the Corrections Officer notified Captain Ivory and Lieutenant Lamer who came to investigate. The Corrections Officer advised Ivory and Lamer that plaintiff refused his command and cursed at him. Plaintiff denied having cursed the Corrections Officer. Ivory again ordered plaintiff to his knees and he again refused. Ivory then ordered plaintiff to put his hands behind his back. When plaintiff complied with this directive, Ivory attempted to push plaintiff to the floor but he was unable to do so. Plaintiff was then charged with Rule Infraction No. 3, "Defiance," and was escorted to Eagle Lock-down. While in Eagle Lock-down plaintiff was forced to sleep on the floor which was infested with rat feces. He was also denied laundry services. The living conditions in the cell were inhumane and the cell was infested with rats and insects. Plaintiff was denied cleaning supplies.

At a disciplinary hearing, plaintiff was found guilty of defiance and was sentenced to serve five days in isolation. For three nights, plaintiff was forced to sleep on the floor of his isolation cell. He was also forced to share the dirty two-person cell with two other inmates.

Plaintiff filed a grievance but prison authorities refused to respond. Nevertheless, plaintiff was moved to Bearcat Lock-down Unit where he had only one cell mate. Plaintiff

experienced the same inhumane conditions in the Bearcat Lock-down as he had experienced while in Eagle Lock-down.

### D. Second Placement in Lockdown

Plaintiff alleges that on March 15, 2004, he was summoned to the office of defendant Whetstine, who made disparaging remarks about plaintiff's Palestinian ethnicity. Plaintiff then began to walk out of her office but Whetstine ordered him to return. Plaintiff was subjected to more insults and then was allowed to return to his dorm.

On May 6, 2004, plaintiff was summoned to Whetstine's office and insulted again. Plaintiff claims that these insults were the consequence of plaintiff's April 5, 2004 grievance in which he complained that Whetstine was smoking and burning candles in the Infinity Building.

Whetstine made further derogatory remarks about plaintiff to Captain Rider. Whetstine told Rider to "take care of that son of a bitch." Rider then ordered plaintiff to put his hands behind his back. Once restrained, Rider escorted plaintiff to Bearcat Lock-down. Defendant Whetstine filed a false disciplinary report charging plaintiff with theft/forgery.

Upon his arrival at Bearcat Lock-down, plaintiff was placed in a cell with two other inmates. He did not receive a mattress until May 7, 2004 thus forcing plaintiff to share a two man cell with two other inmates and to sleep on the dirty cell floor for five days. Plaintiff was cited with additional disciplinary infractions, defiance and property destruction by Sergeant Stenson and Lieutenant Courville. Plaintiff claims that these charges were ordered by defendant Rider.

On May 11, 2004 the Disciplinary Board dismissed the theft/forgery charge but found plaintiff guilty of defiance and property destruction.

On May 11, 2004 plaintiff was again charged with defiance by Lieutenant Beryas. He was

subsequently found guilty and sentenced to serve ten days of isolation.

On May 21, 2004 plaintiff was released from isolation but required to spend an additional four days in Bearcat Lock-down because of "investigation status" ordered by Defendant Rider and approved by Defendant Striedell.

Plaintiff was released from Bearcat Lock-down on May 25, 2004.

On May 21, 2004 plaintiff filed a grievance which was assigned Case Number 04-133. On June 21, 2004 plaintiff's grievance was denied with the following notation, "...the plaintiff does not have a right to be informed about any investigation, you may never be informed and could remain in administrative segregation until pending investigation..."

On June 23, 2004 plaintiff attempted an appeal of Case Number 04-133 but did not receive a response.

As a result of the investigation status, plaintiff was forced to sleep on the floor of Bearcat Lock-down from May 6 - May 10, 2004.

On May 10, 2004 plaintiff filed a grievance concerning this last complaint; prison officials did not respond.   Also on May 10, 2004 plaintiff was offered laundry services but was denied loaner clothing and a substitute blanket thus subjecting him to extremely cold temperatures and inhumane conditions which caused him to become ill. [See allegations in Part A, above]

Plaintiff claims that from May 6 – May 25, 2004 he was forced to endure extreme cold, to sleep on the floor where rats and insects crawled over him, to be exposed to rat feces and other unsanitary conditions. Plaintiff's mattress and blanket became wet from the leaking toilet. Plaintiff was denied cleaning supplies, clean clothes, and adequate laundry services. He was

forced to wear the same clothes for nineteen days.

### E. Third Placement in Lockdown

On July 11, 2004 plaintiff was denied his breakfast tray by Corrections Officer Manning. Plaintiff complained to Captain Celestine who advised plaintiff to return to the cafeteria and request his breakfast. Plaintiff did as he was instructed but upon his return to the cafeteria, Manning ordered him to leave immediately. Manning conferred with Celestine who then ordered plaintiff to return to his dorm without breakfast. Later that day plaintiff telephoned his brother and told him what had transpired. Plaintiff's brother contacted Celestine who advised the brother that plaintiff had in fact been provided breakfast.

Later that day plaintiff was placed in restraints and escorted to Celestine's office. Upon his arrival, Celestine cursed plaintiff and ordered him to leave his office. Plaintiff was escorted to Bearcat Lock-down where he was housed with two other inmates in a two man cell. As a consequence plaintiff was forced to sleep on the floor of this dirty cell. Plaintiff lodged a complaint with Celestine.

Plaintiff was charged with theft by forgery. According to the complaint, plaintiff lied to his brother about not having received a breakfast tray. On July 13, 2004 plaintiff was found guilty of the offense by the disciplinary board and sentenced to 120 days of extended lock-down. Plaintiff claims that Disciplinary Board Chairman Michael Boutte advised him that his conviction and sentence were ordered by Major Stridell because of plaintiff's "...activities as a Muslim leader[3] and his repeated grievances..."

---

[3] Plaintiff claims that upon his arrival at SLCC he was recognized by the Muslim inmates as their religious leader and "...gained a large following..." because he "...gave highly intense, and moving sermons..." He claims that as a result, "the administration initiated an investigation concerning plaintiff's religious activities." Plaintiff claims that he

Plaintiff requested cleaning materials to clean blood and rat feces from the wall of the cell. Defendant Boutte denied his request and insulted plaintiff with an ethnic slur. Therefore, plaintiff filed a grievance complaining about the unsanitary conditions. Prison officials did not respond.

Plaintiff claims that the defendants used the air conditioner to inflict pain on him and other inmates by making the cell extremely cold. He also claimed that in so doing they caused the air conditioner to malfunction which resulted in poor ventilation.

Plaintiff contends that his complaints and his formal grievance, filed on July 15, went unheeded. Such complaints included unsanitary conditions, being forced to sleep on the floor, insufficient amounts of toilet paper provided, being allowed to shower only three times a week, being provided insufficient soap, being forced to wear the same clothes from July 11 - July 21, 2004, being denied the opportunity to shave, and, being denied the opportunity for exercise.

On July 16 plaintiff was transferred to the Eagle Lock-down where he was allowed to share a two man cell with another inmate. However, plaintiff claimed that this cell was also unsanitary, had a foul odor and the toilet leaked. His request for cleaning supplies was ignored and he was forced to live in "inhuman conditions" from July 16 - July 29, 2004. Likewise, during this same period he was denied laundry services and was thus required to wear the same dirty clothes.

On July 19, 2004, William P. Quigley of the Loyola Law Clinic visited SLCC. Plaintiff

encouraged Muslims to join to prison boxing team and otherwise attempted "...to uplift his fellow inmates living standards..." He claims that the disciplinary charges, his conviction and sentence were in retaliation for these activities. Plaintiff claims that during the month of June, 2004 defendant Viator suspended all yard activities "... to stop plaintiff from propergating [sic] and organizing fellow Muslim inmates..." and he "gave defendants Stridell, Rider, and Celestine a green light to further harass and persecute Muslim inmates and further ordered the said defendants namely Rider to discontinue calling Muslim Friday service (Ju'mah) on a regular basis."

informed Quigley "...about the said constitutional violations..." Plaintiff claims that a Corrections Officer, at the instruction of Defendant Streidel, sat near the plaintiff during his interview with Quigley to "ease [sic] drop on their conversation." However, when Quigley complained, the officer left the room. When the conversation concluded, Streidel asked plaintiff to relate what he and Quigley had discussed; when plaintiff refused, Streidel responded with an ethnic slur directed to plaintiff.

On July 21, 2004 plaintiff was transferred to Weasel Extended Lock-down Unit. Plaintiff shared a cell with a smoker who smoked a pack of cigarettes per day. Plaintiff was exposed to "high levels of secondhand" smoke and the cell was extremely hot and unventilated. The Weasel Extended Lock-down was dirty an infested with vermin. Plaintiff was forced to endure these conditions from July 29 – August 2, 2004.

On July 30 plaintiff filed a grievance but the authorities did not respond.

On August 2, 2004 plaintiff was transferred to another institution " ...because of his legal, religious, and political activities that he partook [sic] in while incarcerate [sic] at the ..." SLCC.

## Claims for Relief

Plaintiff has summarized his claims for relief as follows:

### A. Denial of Medical Care

Plaintiff claims that the defendants, "John Doe" and Jimmy Powers failed to provide proper medical treatment for his broken tooth and that as a result he lost "numerous nights of sleep" and missed "countless meals." Plaintiff claims that his back still hurts as a result of having been forced to sleep on the floor for twelve days and that despite his repeated requests, he was never examined by a physician or nurse. Plaintiff claims that he was not treated when he

developed "flu like symptoms and had a high fever" on May 10 – May 18, 2004. Plaintiff claims that these defendants exhibited deliberate indifference to his medical needs.

**B. Hazardous Exposure to Environmental Tobacco Smoke and Biological Pollutants**

Plaintiff claims that Warden Copes and Assistant Warden Viator denied or refused to respond to plaintiff's grievances concerning plaintiff's exposure to environmental tobacco smoke and biological pollutants due to inadequate ventilation and thus exhibited deliberate indifference to plaintiff's health. As a result, plaintiff suffered headaches, watery eyes, runny nose, sneezing, nasal congestion, itching, coughing, and mucus for six months.

**C. Retaliatory Racial Discrimination**

Plaintiff claims that Major Streidell, Captain Rider, Captain Celestine, Lieutenant Whetstine, and Lieutenant Boutte conspired to violate plaintiff's First Amendment right to religious and political freedom through "retaliatory acts." Plaintiff claims that these retaliatory acts of racial discrimination resulted in plaintiff suffering forty-five days of inhumane living conditions in the cell block, including (a) twelve days of sleeping on the floor in an overcrowded and unsanitary cell; (b) forty days of having to wear dirty clothing; (c) denial of cleaning supplies; (d) cold temperatures; (e) thirty days of isolation for a false disciplinary conviction, all of which caused physical and mental pain.

Warden Copes and Assistant Warden Viator refused to respond to plaintiff's repeated grievances despite their knowledge of  racial retaliatory practices; further these defendants denied Muslim inmates the opportunity to practice their religion and prevented Muslim inmates from attending "Ju'mah" services on a regular basis.

## Law and Analysis

**1. Frivolity Review**

When a prisoner sues an officer or employee of a governmental entity pursuant to

42 U.S.C. §1983, the court is obliged to evaluate the complaint and dismiss it without service of

process, if it is frivolous, malicious, fails to state a claim upon which relief can be granted, or

seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C.1915A;

28 U.S.C.1915(e)(2). *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir.1990).

A claim is frivolous if it lacks an arguable basis in law or in fact, *Booker v. Koonce*, 2

F.3d 114, 115 (5th Cir.1993); see, *Denton v. Hernandez*, 504 U.S. 25, 112 S.Ct. 1728, 1733, 118

L.Ed.2d 340 (1992). A civil rights complaint fails to state a claim upon which relief can be

granted if it appears that no relief could be granted under any set of facts that could be proven

consistent with the allegations of the complaint. Of course, in making this determination, the

court must assume that all of the plaintiff's factual allegations are true. *Bradley v. Puckett*, 157

F.3d 1022, 1025 (5th Cir.1998).

A hearing need not be conducted for every *pro se* complaint. *Wilson v. Barrientos*, 926

F.2d 480, 483 n. 4 (5th Cir.1991). A district court may dismiss a prisoner's civil rights complaint

as frivolous based upon the complaint and exhibits alone. *Green v. McKaskle*, 788 F.2d 1116,

1120 (5th Cir.1986).

District courts must construe *in forma pauperis* complaints liberally, but, they are given

broad discretion in determining when such complaints are frivolous. *Macias v. Raul A.

(Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir.1994).

A civil rights plaintiff must support his claims with specific facts demonstrating a

constitutional deprivation and may not simply rely on conclusory allegations. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir.1995). Nevertheless, a district court is bound by the allegations in a plaintiff's complaint and is "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint." *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d at 97.

Plaintiff's complaint specifically details his theories of liability with respect to each named defendant. The thoroughness of the complaint convinces the court that plaintiff has pled his best case and need not be afforded any further opportunity to amend.

Accepting all of plaintiff's allegations as true, the court concludes, for the reasons stated hereinafter, that he has failed to state a claim for which relief may be granted and accordingly, recommends dismissal of the complaint.

**2. Medical Care**

Plaintiff was an inmate in the custody of the LDOC during his stay at the SLCC. As such, his medical care claims must be analyzed under the Eighth Amendment's right to be free from cruel and unusual punishment. That right is violated only if the defendants act with deliberate indifference to a substantial risk of serious medical harm which results in injury. Deliberate indifference requires that the defendants have subjective knowledge of the risk of harm. Mere negligence or a failure to act reasonably is not enough. The defendants must have the subjective intent to cause harm. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)

Thus, plaintiff can establish an actionable constitutional violation only if he alleges facts tending to establish that the defendants were deliberately indifferent to his serious medical needs. *Thompson v. Upshur County, Texas*, 245 F.3d 447, 457 (5th Cir.2001). Plaintiff has not, nor can

he, make such a showing.

Deliberate indifference in the context of the failure to provide reasonable medical care to a convict means that: (1) the prison officials were aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the officials actually drew that inference; and (3) the officials' response indicated that they subjectively intended that harm occur. *Id.* at 458-59. "[T]he failure to alleviate a significant risk that [the official] <u>should have perceived</u>, but did not is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001). Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir.1997); see also *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir.1999). The fact that a plaintiff disagrees with what medical care is appropriate does not state a claim of deliberate indifference to serious medical needs. See *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir.1997).

Plaintiff has not alleged sufficient facts to establish deliberate indifference with respect to his medical care claims, however, he should be allowed the opportunity to provide additional facts in support of this claim. Therefore, this claim survives initial review.

### 3. Disciplinary Proceedings

Plaintiff claims that he was wrongfully convicted of rules violations on three separate occasions and ultimately sentenced to serve time in lock-down following each of the convictions. With its decision in the case of *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 2294, 132 L.Ed.2d 418 (1995), the Supreme Court significantly narrowed the ambit of a prisoner's potential

Fourteenth Amendment due process liberty claims. Following *Sandin*, a prisoner has a liberty interest only in "freedom[s] from restraint ... impos[ing] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," and these will normally consist of deprivations which clearly impinge on the <u>duration</u> of confinement. *Orellana v. Kyle*, 65 F.3d 29, 31-32 (5th Cir.1995)(quoting *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 2294, 132 L.Ed.2d 418 (1995)).

Plaintiff lost no good time[4] by virtue of the allegedly inadequate or unfair disciplinary proceedings which resulted in his placement in lock-down, therefore, he has no federally protected due process rights in connection with the proceedings. Consequently, plaintiff's claims against the defendants lacks an arguable basis in law and is frivolous. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

**4. Conditions of Confinement**

Plaintiff complains of the conditions of confinement, both in the lock-downs and in the dormitory to which he was assigned; his complaint suggests that, like his medical care claims, these conditions of confinement are violative of his right to be free from cruel and unusual punishment and thus are in violation of the Eighth Amendment.

"The Constitution does not mandate comfortable prisons ... but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the

---

[4] Plaintiff claims, in passing, that as a result of one of his disciplinary convictions, he was "...denied the opportunity to reenter the prison education program, and also denied the right to receive ten (10) days good-time school-credit that the plaintiff earned." The <u>possibility</u> that plaintiff might have missed the opportunity to earn good-time due to being excluded from the prison education program fails to support any claim of a civil rights violation because plaintiff is not <u>guaranteed</u> the right to earn good-time. *Malchi v. Thaler*, 211 F.3d 953, 959 (5th Cir.2000). Further, plaintiff's speculative concerns that he lost good-time due to his disciplinary convictions are not actionable either because he has failed to show that he has actually suffered any harm as a result of the defendants' actions. See *Biliski v. Harborth*, 55 F.3d 160, 162 (5th Cir.1995), citing *Hernandez v. Maxwell*, 905 F.2d 94, 95 (5th Cir.1989). See also *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir.1995); *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir.1995).

conditions under which he is confined are subject to scrutiny under the Eighth Amendment."
*Harper v. Showers*, 174 F.3d 716, 719 (5th Cir.1999) quoting *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995). Specifically, a prisoner must allege facts which suggest that the prison officials' conduct resulted in the plaintiff being incarcerated under "conditions which [posed] an unreasonable risk of damage to [the prisoner's] future health." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir.2001). This "risk must be of such a level that today's society would not tolerate it." *Id.* In order to prevail on such a conditions of confinement claim, a plaintiff must plead facts which establish: (1) objectively, that the deprivations are sufficiently serious; and (2) subjectively, that the defendant prison officials knew of the deprivations but nevertheless have shown a "deliberate indifference" to the plaintiff's "health or safety." *Id.*; see also *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir.1998).

In order to successfully plead "deliberate indifference," the plaintiff must allege facts (and not conclusory allegations) which demonstrate that the defendants knew of but disregarded a substantial risk of serious harm to his health. *Farmer v. Brennan*, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Further, he must plead facts which establish that the defendants: (1) were aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed. *Id.*

Plaintiff makes some specific conditions of confinement claims.

### 5. Exposure to Environmental Tobacco Smoke/Poor Ventilation

The vague, speculative, contradictory and conclusory allegations in plaintiff's complaint do not sufficiently state a claim for the excessive exposure to environmental tobacco smoke. See *Helling v. McKinney*, 509 U.S. 25, 35-36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). He has not

shown that the deprivations complained of were sufficiently serious; but, even had he done so, he has not alleged that the defendants were aware of the risk to his health and were nonetheless indifferent to his plight. In fact, the pleadings suggest that the prison administration believed that his exposure was "mild" and that the prison was well-ventilated.

### 6. Conditions of Confinement – Lock-down Cell

Plaintiff's claim concerning the conditions of confinement in the Bearcat, Eagle, and Weasel Lock-downs fair no better. In his complaint plaintiff alleged that the lock down cells were designed to house two inmates. On various occasions, he was forced to share a two-person lock-down cell with two other inmates. On the first occasion, February, 2004, he was in an over-crowded lock-down cell for only three days; on the second occasion, May, 2004, he stayed in the over-crowded cell for only five days; on the third occasion, July, 2004, plaintiff did not allege overcrowding as a complaint. Thus, at most, plaintiff was forced to endure his placement in an overcrowded lock-down cell for relatively short periods of time, and for no more than twelve days in total.

Otherwise, he complained that the cell was cold. "While the temperature in ... lock-down may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment." *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995). Additionally, since the conditions complained of lasted for only brief periods of time, there is some question as to whether or not such short periods of confinement may even give rise to a valid Eighth Amendment violation. Of course, the Fifth Circuit has found violations of the Eighth Amendment for conditions lasting less then twenty-four hours, but in that case, the conditions were clearly more deplorable than those alleged herein by the plaintiff. (See *Palmer v. Johnson*, 193 F.3d 346, 354 (5th Cir.1999) (finding

Eighth Amendment violation where inmates were herded into a small outdoor space, deprived of protection from excessive cold and wind, and provided no sanitary means of disposing of their waste, even though the conditions lasted approximately seventeen hours). Certainly, the length of time spent in offensive conditions should be taken into account. *Hutto v. Finney*, 437 U.S. 678, 686-87, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. <u>A filthy, overcrowded cell ... might be tolerable for a few days and intolerably cruel for weeks or months.</u>"); *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir.1998) (finding no Eighth Amendment violation where inmate was kept in filthy cell for only three days and was given cleaning supplies). Plaintiff's short stays in lock-down under the conditions alleged does not rise to the level of cruel and unusual punishment.

In order to prevail on these claims, plaintiff must allege (and ultimately prove) that the conditions complained of – inadequate ventilation and second hand smoke in the dorm and lock-down cell, cold temperature and unsanitary conditions in lock-down were "so serious as to deprive [plaintiff] of the minimal measure of life's necessities..." see *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995)(quotation marks omitted). This he has not done.

Consequently, plaintiff's conditions of confinement claims against the defendants lack an arguable basis in law and are frivolous. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

### 7. Retaliation

Plaintiff claims that his prison disciplinary convictions and the lock-down sentences imposed were an act of retaliation based upon his race and/or religion. It is well established that prison officials may not retaliate against an inmate because that inmate exercised a right

guaranteed to him under the constitution. *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir.1995),

*cert. denied*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996). To state a claim of

retaliation, a prisoner must allege facts which establish that (1) he exercised a specific

constitutional right, (2) the defendant had the intent to retaliate against him for his exercise of

that right, (3) a retaliatory adverse act occurred, and (4) causation. Causation requires a showing

that "but for the retaliatory motive the complained of incident ... would not have occurred."

*Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir.1997) (quoting *Woods*, 60 F.3d at 1166), *cert.*

*denied*, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997); *McDonald v. Steward*, 132 F.3d

225 (5th Cir. 1998). "The inmate must allege more than his personal belief that he is the victim of

retaliation." *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir.1999).. "The inmate must

produce direct evidence of motivation or, the more probable scenario, allege a chronology of

events from which retaliation may plausibly be inferred." *Id.* (quoting *Woods v. Smith,* 60 F.3d

1161, 1166 (5th Cir.1995), *cert. denied sub nom Palermo v. Woods*, 516 U.S. 1084(1996)).

Plaintiff claims that the defendants continually retaliated against him however, he fails to

offer anything more than conclusory allegations in support of this claim. He has failed to allege

a pattern of retaliation and does not allege any evidence of motive on the part of any defendants.

He claims that his transfer from SLCC was an act of retaliation because of the "legal,

religious and political activities" he engaged in at SLCC. Of course, the constitution does not

protect a duly convicted prisoner against transfer from one institution to another. *Meachum v.*

*Fano*, 427 U.S. 215, 223- 25, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). The United States

Supreme Court has repeatedly found that prison officials have broad administrative and

discretionary authority over the institutions they manage and that lawfully incarcerated persons

retain only a narrow range of protected liberty interests. Prison officials need broad

administrative authority because running a prison is an "extraordinarily difficult undertaking." *Mitchell v. Sheriff Department*, 995 F.2d 60, 62-63 (5th Cir.1993), citing *Wolff v. McDonnell*, 418 U.S. at 564-66, 94 S.Ct. at 2979; *Jackson v. Cain*, 864 F.2d 1235, 1247 (5th Cir.1989), citing *Hewitt v. Helms*, 459 U.S. 460, 466-68, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Transfer from one penal institution to another does not in itself state a due process claim because, in the absence of an appropriate state regulation, a prisoner has no liberty interest in residence in one prison or another. *Jackson v. Cain*, 864 F.2d at 1250, citing *Meachum v. Fano*, 427 U.S. at 223-25, 96 S.Ct. at 2538.

Further, plaintiff's suggestion that his disciplinary charges and convictions were acts of retaliation, are also without merit. As shown above, in order to establish retaliation, plaintiff must show that "but for" the exercise of a specific constitutional right, the alleged retaliatory act would never have occurred. The pleadings suggest that he is unable to establish any causative link between the practice of his religion and the three disciplinary hearings he was subjected to.

Consequently, plaintiff's retaliation claim lacks an arguable basis in law and is frivolous. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

### 8. Free Exercise of Religion

Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. Of course, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights. The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives – including institutional security. See *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

The standard for evaluating an inmate's claim that a prison regulation or practice

improperly restricts his right to the free exercise of his religion requires the court to evaluate the regulation or practice in order to determine whether it "is reasonably related to legitimate penological interests." *Id.* at 349.

The "reasonableness" of a regulation or practice is evaluated based upon the following inquiry: (1) Is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward by prison officials to justify the regulation? (2) Are there alternative means of exercising the right that remain open to prison inmates, that is, are inmates allowed other means to express their religious beliefs on a general level? (3) What impact will accommodation of the asserted constitutional right have on guards and other inmates and on the allocation of prison resources generally? (4) Are alternatives to the prison regulation available that would accommodate the inmates' rights at a *de minimis* cost to valid penological interests? *Green v. Polunsky*, 229 F.3d 486, 489-90 (5th Cir.2000) (internal quotations and citations omitted). Each factor need not be considered, and the factors need not be evaluated evenly. *Scott v. Mississippi Dep't of Corrections*, 961 F.2d 77, 80 (5th Cir.1992).

Plaintiff contends that Warden Copes and Assistant Warden Viator denied Muslim inmates the opportunity to practice their religion and to attend Ju'mah services on a regular basis.

Plaintiff's complaint is controlled by the Supreme Court's decision in *O'Lone v. Estate of Shabazz, supra*. In that case, the inmate-plaintiffs complained that they were not allowed to attend the weekly Muslim congregational service held on Friday evenings because of their assignments to work details outside the main prison grounds. *O'Lone v. Estate of Shabazz*, 482 U.S. at 345-46. The Supreme Court considered the evidence supplied by the prison administration regarding security needs, rehabilitative needs, and the impact of alternative

accommodations; this evidence was evaluated in the light of those rights actually retained by the inmates to practice their religion. The Court then noted that the plaintiff- inmates were not deprived of <u>all</u> forms of religious exercise. Based upon these facts, the Supreme Court held that the "ability on the part of [the inmates] to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable." *Id.* at 352.

Like the plaintiffs in *O'Lone v. Estate of Shabazz*, plaintiff has not, nor can he show that he has been deprived of <u>all means</u> of religious expression. Plaintiff cites only one instance where scripture study and worship was curtailed. [Doc. 1-3, ¶81] Further, he was able to exert leadership over the SLCC Muslim population and he was permitted to and did give "highly intense and moving sermons" which resulted in him gaining a large following over a short period of time.

Plaintiff claims that Defendant Rider "refused to call for Friday Islamic religious services on a regular basis..." but he does not state how many of these services were actually prohibited. Further, it is clear that even if the inmates' right to participate in Ju'mah were curtailed, other means of religious expression were tolerated. In short, plaintiff has failed to demonstrate that his First Amendment free-exercise right has been violated. See *Mumin v. Phelps*, 857 F.2d 1055, 1056 (5th Cir.1988) (holding that prison regulation prohibiting Muslim inmates from attending Friday services was not unconstitutionally restrictive because it satisfied all four "reasonableness" considerations). Even "the loss of [his] absolute freedom of religious expression is but one sacrifice required by [his] incarceration...." *Scott v. Mississippi Dep't of Corrections*, 961 F.2d at 82. See *Abdur-Rahman v. Michigan Dep't of Corrections*, 65 F.3d 489, 492 (6th Cir.1995) ("Reasonable time, place, or manner restrictions upon communal religious gatherings do not necessitate the identification of a compelling state interest.").

**9. Verbal Taunts**

Plaintiff has also complained about being verbally abused by prison staffers who taunted him because of his religion and ethnicity. Such activity while deplorable does not state a cause of action since allegations of verbal abuse do not present an actionable section 1983 claim. *Bender v. Brumley*, 1 F.3d 271, 274 (5th Cir.1993). The threatening language and gestures of a custodial officer do not amount to a constitutional violation. *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir.); *cert. denied*, 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983)(quoting *Coyle v. Hughs*, 436 F.Supp. 591, 593 (W.D.Okla.1977)). Consequently, these allegations lack an arguable basis in law and are frivolous. *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

**10. Equal Protection Claim**

To the extent that this complaint may be liberally construed to raise an equal protection complaint, plaintiff has again failed to state a claim upon which relief may be granted. To state an equal protection claim under § 1983, a plaintiff must show that "the governmental action in question classif[ies] or distinguish[es] between two or more relevant persons or groups[,] ... or ... impermissibly interferes with a fundamental right." *Edwards v. Johnson*, 209 F.3d 772, 780 (5th Cir.2000) (internal quotations and citations omitted). The plaintiff must specifically demonstrate that the prison officials acted with a discriminatory purpose. *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir.1995). "Discriminatory purpose in an equal protection context implies that the decision maker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Id.*; *Edwards v. Johnson*, 209 F.3d at 780.

While plaintiff and his coreligionists may be an identifiable group within the prison, he

has failed to show that the policy or practice complained of was enacted with any discriminatory purpose. See *Muhammad v. Lynaugh*, 966 F.2d 901, 903 (5th Cir.1992) (finding no constitutional violation where plaintiffs were "given the same reasonable opportunity to practice their faith as that provided other religious groups"). Because plaintiff has failed to demonstrate a violation of his individual constitutional rights or a violation of the rights of all Muslim inmates housed at SLCC to practice their religion, his equal protection claim (to the extent that such a claim has been asserted) has no merit.

### 11. Inadequate Grievance Procedure

An inmate does not have a constitutional entitlement to an adequate grievance procedure. See e.g., *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994) (there is no constitutional right to participate in grievance procedures); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430-31 (7th Cir.1996) (inmates do not have a constitutional right to an adequate grievance procedure; any right to inmate grievance procedure is procedural, not substantive, right and, thus, state's inmate grievance procedures do not give rise to liberty interest protected by due process clause); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir.1991) (*per curiam*) (inmates do not have a constitutional right to participate in grievance procedures); *Jenkins v. Henslee*, 2002 WL 432948, *2 (N.D.Tex. Mar 15, 2002) (NO. 3-01-CV-1996-R). Although exhaustion of administrative remedies is a condition precedent to filing a suit arising under § 1983, see 42 U.S.C.1997e(a), its ineffectiveness or altogether absence does not give rise to a constitutional claim. Hence any alleged violation of the grievance procedure as alleged in plaintiff's complaint does not amount to a constitutional violation.

Accordingly,

**IT IS RECOMMENDED** that the <u>following claims</u> raised in plaintiff's civil rights complaint be **DISMISSED WITH PREJUDICE** as frivolous and for failing to state a claim on which relief may be granted:[5]

**ALL CLAIMS CONCERNING –**

    a. Disciplinary Proceedings;

    b. Conditions of Confinement in General;

    c. Exposure to Environmental Tobacco Smoke/Poor Ventilation;

    d. Conditions of Confinement in Lock-Down Cell;

    e. Retaliation;

    f. Free Exercise of Religion;

    g. Verbal Taunts;

    h. Equal Protection; and

    i. Inadequate Grievance Procedure.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b),**

---

[5] Plaintiff's complaint, insofar as it alleges inadequate or delayed medical care will remain viable and a separate order concerning the disposition of that claim will follow.

**shall bar an aggrieved party from attacking either the factual findings or the legal**

**conclusions accepted by the District Court, except upon grounds of plain error. See**

*Douglas v. United Services Automobile Association,* **79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on May 19, 2006.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)